# 24-0696-cv

## United States Court of Appeals
### *for the*
## Second Circuit

CYNTHIA T. DOYLE, in their Capacities as Trustees of the Peter and Elizabeth C. Tower Foundation, MOLLI T. BYRNES, in their Capacities as Trustees of the Peter and Elizabeth C. Tower Foundation, JAMES WEISS, in their Capacities as Trustees of the Peter and Elizabeth C. Tower Foundation, DAVID WELBOURN, in their Capacities as Trustees of the Peter and Elizabeth C. Tower Foundation,

*Plaintiff-Appellees,*

– v. –

UBS FINANCIAL SERVICES INC., JAY S. BLAIR,

*Defendants-Appellants,*

JOHN N. BLAIR,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANTS-APPELLANTS

TERRANCE P. FLYNN
HARRIS BEACH PLLC
*Co-Counsel for Defendants-Appellants*
726 Exchange Street, Suite 1000
Buffalo, New York 14210
(716) 200-5050

JOSHUA S. BRATSPIES
SHERMAN ATLAS SYLVESTER
  & STAMELMAN LLP
*Co-Counsel for Defendants-Appellants*
1185 Avenue of Americas, 3rd Floor
New York, New York 10036
(212) 763-6466

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant UBS Financial Services Inc. hereby files its corporate disclosure statement as follows. UBS Financial Services Inc. is a 100% owned subsidiary of UBS Americas Inc. UBS Americas Inc. is a 100% owned subsidiary of UBS Americas Holding LLC. UBS Americas Holding LLC is a 100% owned subsidiary of UBS AG.  UBS AG is a 100% owned subsidiary of UBS Group AG, which is a publicly-traded company formed under the laws of Switzerland.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................i

TABLE OF AUTHORITIES ....................................................................iv

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES .......................................................................1

STATEMENT OF THE CASE....................................................................2

     A.    The Nature Of The Case, Course of Proceedings, And
Disposition Below ...........................................................................2

     B.    Statement Of Facts ..........................................................................5

          1.    The Parties....................................................................5

          2.    The Foundation's Brokerage Accounts at UBS...........6

          3.    The UBS Arbitration Agreement .................................6

          4.    The 2015 Consent Adopted By The Foundation's
Investment Committee ..................................................8

          5.    John Blair's Removal As Trustee .................................8

          6.    The Instant Action ........................................................9

STANDARD OF REVIEW ......................................................................10

SUMMARY OF ARGUMENT .................................................................11

ARGUMENT ...........................................................................................13

     POINT I

     THE DISTRICT COURT ERRED IN DECLINING TO GRANT
THE MOTION TO COMPEL ARBITRATION AS A MATTER
OF LAW .........................................................................................13

     A.    The Foundation's Ratification and Approval Of The UBS
Client Relationship Agreement Is Dispositive Of The Motion
To Compel Arbitration ...................................................................13

B.    There Is No Competent Evidence Disputing John Blair's Apparent Authority To Bind The Foundation To The UBS Client Relationship Agreement ........................................................... 16

POINT II

ALTERNATIVELY, THE DISTRICT COURT ERRED IN RULING THAT THE VALIDITY OF THE ARBITRATION AGREEMENT SHOULD BE DETERMINED BY THE DISTRICT COURT, NOT THE ARBITRATOR ............................................................ 20

POINT III

ALTERNATIVELY, THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT SETTING AN EVIDENTIARY HEARING TO DECIDE THE ISSUE OF ARBITRABILITY ................... 25

CONCLUSION ......................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*,
   307 F.3d 24 (2d Cir. 2002) ........................................................ 22, 23

*American Bureau of Shipping v. Tencara Shipyard S.P.A.*,
   170 F.3d 349 (2d Cir. 1999) ........................................................15

*Dean Witter Reynolds Inc. v. Byrd*,
   470 U.S. 213 (1985)........................................................................19

*Dun Shipping Ltd. v. Amerada Hess Shipping Corp.*,
   234 F. Supp. 2d 291 (S.D.N.Y. 2002) ........................................25

*First Nat. Bank of Ariz. v. Cities Service Co.*,
   391 U.S. 253 (1968)........................................................................15

*Gudge v. 109 Restaurant Corp.*,
   118 F. Supp. 3d 543 (E.D.N.Y. 2015) ........................................26

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*,
   729 F.3d 99 (2d Cir. 2013) ...........................................................10

*Levin v. Alms and Associates, Inc.*,
   Civil Action No. MJG-09-3403, 2010 WL 11545691
   (D. Md. July 22, 2010), *rev'd on diff. grounds* 623 F.3d 260
   (4th Cir. 2011) ...............................................................................24

*Major League Baseball Properties, Inc. v. Salvino*,
   542 F.3d 290 (2d Cir. 2008) .........................................................17

*Marmet Health Care Ctr., Inc. v. Brown*,
   565 U.S. 530 (2012)........................................................................19

*Masuda v. Kowasaki Dockyard Co.*,
   328 F.2d 662 (2d Cir. 1964) .........................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................15

*Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*,
   229 F.3d 397 (2d Cir. 2000) .........................................................10

iv

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..................................................................... 23-24

*National Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Systems, LLC*,
    289 F. Supp. 3d 457 (S.D.N.Y. 2018) ..........................................25

*New York v. Oneida Indian Nation of N.Y.*,
    90 F.3d 58 (2d Cir. 1996) ..............................................................10

*Operative Plasterers & Cement Masons Int'l Assoc. v. Int'l Brotherhood
    of Painters and Allied Traders*,
    954 F. Supp. 563 (E.D.N.Y. 1997) ...............................................25

*Parsons & Whittemore Overseas Co. v.
    Societe Generale De L'Industrie Du Papier (RAKTA)*,
    508 F.2d 969 (2d Cir. 1974) ..........................................................26

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
    582 F.3d 244 (2d Cir. 2009) ..........................................................17

*Preston v. Ferrer*,
    552 U.S. 346 (2008)........................................................................24

*Prima Paint Corp. v. Flood & Conklin Mfg.*,
    388 U.S. 395 (1967)............................................................... 22, 23

*Rodriguez de Quijas v. Shearson/American Exp, Inc.*,
    490 U.S. 477 (1989)........................................................................19

*Shearson/American Exp, Inc. v. McMahon*,
    482 U.S. 220 (1987)........................................................................20

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*,
    263 F.3d 26 (2d Cir. 2001) ........................................... 20, 21, 22, 23

*Telenor Mobile Commc'ns AS v. Storm LLC*,
    584 F.3d 396 (2d Cir. 2009) ..........................................................18

*United States v. Harrell*,
    268 F.3d 141 (2d Cir. 2001) ..........................................................16

*United States v. Williams*,
    504 U.S. 36 (1992)..........................................................................16

*Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
    489 U.S. 468 (1989)........................................................................10

v

**Statutes & Other Authorities:**

9 U.S.C. § 16(a)(1)(C) ...................................................................1

28 U.S.C. § 1331 ..........................................................................1

Uniform Trust Code §1012 ..........................................................18

Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts*
  § 1:20, (4th ed.1990)............................................................ 20, 22

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331. On February 23, 2024, the District Court issued a decision and order denying Appellants' motion to compel arbitration. SPA-1–17. Appellants filed a timely notice of appeal on March 8, 2024. JA-1282. This Court has jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(C) to hear this appeal from an order denying an application to compel arbitration.

## STATEMENT OF ISSUES

1.      Whether the District Court erred in finding that Appellees' claims against Appellants should not be compelled to arbitration as a matter of law.

2.      Alternatively, assuming there are issues of fact concerning the validity of the arbitration agreement, whether the District Court erred in ruling that such fact issues should be decided by the District Court, and not the arbitrator.

3.      Alternatively, assuming there are issues of fact concerning the validity of the arbitration agreement that are properly decided by the District Court, whether the District Court erred by not setting an evidentiary hearing to resolve such fact issues prior to proceeding with the merits of the case.

1

## STATEMENT OF THE CASE

**A.    The Nature Of The Case, Course of Proceedings, And Disposition Below**

This action involves a dispute over certain brokerage accounts that the Peter and Elizabeth C. Tower Foundation (the "Foundation") held at Appellant UBS Financial Services Inc. ("UBS") and which were serviced by a financial advisor team that included Appellant Jay S. Blair ("Jay Blair").  JA-980 ¶ 4, JA-982–1030, JA-20 ¶ 49–50, JA-22 ¶ 65, JA-886–934.

Appellees, Cynthia T. Doyle, Mollie T. Byrnes, James Weiss and David Welborn, who are trustees of Foundation, filed a Complaint in the District Court alleging that Appellants violated the Investment Advisers Act of 1940, breached their fiduciary duties and were negligent in connection with the opening, management and transfer out of the Foundation's brokerage accounts at UBS.  JA-15 ¶ 25, JA-32–39 ¶¶ 1–3, JA-40–41 ¶¶ 5–6.  These allegations stem from Appellees' dispute with their one-time fellow trustee, Defendant John N. Blair ("John Blair"), who for many years directed the financial advisor team that included Jay Blair regarding the Foundation's brokerage accounts, first at Smith Barney/Morgan Stanley and later at UBS.  JA-17 ¶ 35, JA-20 ¶¶ 49–50.  Appellees now claim for purposes of this litigation that John Blair did not have their approval to open the Foundation's investment accounts at UBS in the first place.  JA-33 ¶¶ 118-19.

The Foundation's relationship with UBS is governed by a Client Relationship Agreement, which requires that "any controversy, claim or issue in any controversy that may arise" be resolved in arbitration before the Financial Industry Regulatory Authority ("FINRA"). JA-1024, JA-928. On March 10, 2023, Appellants filed a motion with the District Court seeking to compel Appellees' claims against them to FINRA arbitration in accordance with the terms of the UBS Client Relationship Agreement. JA-961–62.

The District Court, Honorable Frank P. Geraci, Jr. presiding, denied Appellants' motion to compel arbitration, finding that Appellees' allegation that John Blair "lacked authority to bind the foundation to the Agreement" presented "sufficient evidence to place the validity of the Agreement at issue for trial." SPA-8.

The District Court noted in its decision that, just a few weeks after John Blair executed the Client Relationship Agreement with UBS, the Foundation's Investment Committee adopted a Statement of Unanimous Written Consent in Lieu of Meeting, dated September 23, 2015 (the "2015 Consent"), which "ratified and approved" John Blair's execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the [Foundation] Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair[.]" SPA-5. The District Court

3

also recognized that the 2015 Consent explicitly authorized John Blair to "make, execute and deliver the UBS Agreements[.]" SPA-5.

Based on the foregoing, the District Court acknowledged that the 2015 Consent "looms large over this discussion" because it "ostensibly ratified the Agreement" and "appears to be clear and unequivocal in its post hoc approval" of John Blair's execution of the UBS Client Relationship Agreement. SPA-14. Notwithstanding the foregoing, the District Court inexplicably concluded that there was a "triable issue of fact with respect to whether John N. Blair lacked authority to execute the Agreement." SPA-16.

The District Court also recognized that, on the issue of John Blair's apparent authority to bind the Foundation, Appellees were "required" to present evidence that Appellants "knew or should have known" of John Blair's alleged lack of authority to execute the UBS Client Relationship Agreement, but concluded that the "thin" evidence adduced by Appellees that Jay Blair had been involved with the Foundation since 2006 was "sufficient to pass muster" and "place the making of the agreement to arbitrate at issue." SPA-13.

Further, the District Court held that Appellees have adequately alleged that the UBS Client Relationship Agreement is "void *ab initio*, not merely voidable" such that the "validity of the Agreement" is an "issue for trial" before the District Court, not the arbitrator. SPA-16, 8. The District Court did not provide any supporting

4

reasoning for its ruling on this issue. SPA-16. Nor did the District Court address Appellants' argument that claims to rescind an agreement, such as Appellees' claims here, are premised on the existence of a contract, and therefore seek to have the contract declared voidable, not void; and, as a result, such claims for rescission must go to arbitration under controlling case law. JA-1271–78.

Finally, the District Court found "triable issues of fact" that it ruled were "sufficient evidence to place the validity of the Agreement at issue for trial", but the District Court did not set an evidentiary hearing to decide the issue of arbitrability before proceeding with the merits of the case. SPA-8, 11, 16.

## B.  Statement Of Facts

### 1.  The Parties

The Foundation is a charitable trust that was created by Peter Tower and Elizabeth C. Tower. JA-14 ¶ 20. Appellees Cynthia T. Doyle, Mollie T. Byrnes, James Weiss and David Welbourn are several of the trustees of the Foundation. JA-15 ¶ 25.

UBS is a member of FINRA and is engaged in the business of providing securities brokerage services. JA-980 ¶ 2. Jay Blair is employed by UBS and part of a financial advisor team known as the Arthurs Malof Group. JA-13 ¶ 15, JA-20 ¶ 49.

Defendant John Blair, who is not a party to this appeal, served as a trustee of the Foundation for many years until he was removed in November 2020. JA-13 n.1. John Blair is the father of Jay Blair. JA-16–17 ¶ 33.

### 2. The Foundation's Brokerage Accounts at UBS

For many years, the Arthurs Malof Group, which includes Jay Blair, served as the financial advisors for the Foundation's brokerage accounts, initially at Smith Barney/Morgan Stanley, and later at UBS. JA-16–17 ¶ 33, JA-19 ¶¶ 44–45, JA-20 ¶¶ 49–50.

In or around 2015, when the Arthurs Malof Group moved from Smith Barney/Morgan Stanley to UBS, the Foundation moved their investment assets to brokerage accounts opened at UBS. JA-980 ¶ 3, JA-20 ¶¶ 49–50, JA-22 ¶ 65, JA-886–934.

### 3. The UBS Arbitration Agreement

In connection with the opening of the Foundation's brokerage accounts at UBS, John Blair, as a trustee of the Foundation, executed on September 3, 2015 a Client Relationship Agreement governing the Foundation's relationship with UBS. JA-980 ¶ 4, JA-982–1030, JA-22 ¶ 65, JA-886–934.

The UBS Client Relationship Agreement expressly provides for the mandatory arbitration before FINRA[1] of "any controversy, claim or issue in any controversy that may arise . . . including but not limited to controversies, claims or issues in any controversy concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement." JA-1024, 928.

The UBS Client Relationship Agreement further provides that, by agreeing to arbitrate all disputes, the parties "are giving up the right to sue each other in court including the right to a trial by jury" and that "any arbitration under this Agreement shall be governed by the Federal Arbitration Act[.]" JA-1024, 928.

Further, on the trustee signature page to the UBS Client Relationship Agreement, John Blair expressly represented to UBS, among other things, that: (i) "I acknowledge and agree with the terms and conditions of the UBS Client Relationship Agreement"; and (ii) "As trustee, I have full power under the trust agreement to make this Trust Certification and to submit valid orders and other instructions on behalf of the trust." JA-1032–35.

---

[1] FINRA was created in 2007 through the consolidation of the NASD and the member regulation, enforcement and arbitration operations of the New York Stock Exchange. FINRA operates one of the largest dispute resolution forums in the United States and has many experienced arbitrators who are familiar with and specifically trained on disputes arising from the financial services industry. JA-969 n.2.

7

### 4. The 2015 Consent Adopted By The Foundation's Investment Committee

Just a few weeks after John Blair executed the Client Relationship Agreement with UBS, the Foundation's Investment Committee, which was responsible for the investment and management of the Foundation's assets (and of which two of the Appellees are members), adopted the 2015 Consent. JA-941–944.

The 2015 Consent "ratified and approved" John Blair's execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the [Foundation] Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair . . . ." JA-943. The 2015 Consent also explicitly authorized John Blair to "make, execute and deliver the UBS Agreements[.]" JA-944.

### 5. John Blair's Removal As Trustee

In or around November 2020, Plaintiffs and the other trustees removed John Blair as a trustee of the Foundation. JA-16 ¶ 29, JA-133–853. John Blair's removal as trustee is the subject of a separate New York Surrogate's Court action that has been pending for several years between John Blair and Plaintiffs. JA-13 n.1. UBS and Jay Blair are not parties to the New York Surrogate's Court action. JA-13 n.1.

8

### 6. The Instant Action

In April 2022, Plaintiffs and the other trustees of the Foundation adopted a resolution, dated April 8, 2022 (the "Resolution"), authorizing the commencement of legal proceedings against Appellants. JA-15 ¶ 26, JA-121–132.

In apparent recognition that the Client Relationship Agreement requires all disputes with UBS to be arbitrated before FINRA, the Resolution specifically authorizes the Foundation to, among other things, "commence a FINRA arbitration against UBS and Jay S. Blair to effectuate the majority vote of the Foundation's Investment Committee to terminate the services of UBS, to retain the services of Wilmington Trust Investment Advisors, Inc. to transfer the Foundation's assets to Wilmington Trust Investment Advisors, Inc. and to seek appropriate damages from UBS, John N. Blair and Jay S. Blair." JA-123. The Resolution further authorizes Appellees to bring and supervise any such FINRA arbitration on behalf of the other trustees. JA-123.

Notwithstanding the foregoing, three days after the adoption of this Resolution, Plaintiffs filed a lawsuit in the District Court against Appellants and John Blair. JA-9–43. All of Plaintiffs' claims stem from Appellants' alleged conduct in connection with the opening, management and transfer out of the Foundation's brokerage accounts at UBS. JA-32–39 ¶¶ 110–155, JA-40–41 ¶¶ 165–177.

9

Appellees' Complaint asserts claims against Appellants under the Investment Advisers Act of 1940 and for breach of fiduciary duty and negligence. JA-32–39 ¶¶ 110–155, JA-40–41 ¶¶ 165–177. Pursuant to their claim under the Investment Advisers Act, Appellees are seeking rescission of the Foundation's investment advisory agreement with UBS, restitution of payments made to UBS pursuant to the agreement, and other damages. JA-32–35 ¶¶ 110–130.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion to compel arbitration. *See, e.g., Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*, 229 F.3d 397, 402 (2d Cir. 2000). "In applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [Federal Arbitration] Act . . . due regard must be given to the federal policy favoring arbitration . . . ." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475–76 (1989). "In accordance with that policy, [this Court] resolve[s] doubts as to the arbitrability of a claim in favor of arbitrability." *New York v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996) (citations and internal quotations omitted).

Further, this Court reviews a decision not to set an evidentiary hearing under an abuse of discretion standard. *See Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 103 (2d Cir. 2013).

## SUMMARY OF ARGUMENT

In 2015, John Blair, a duly-appointed trustee of the Foundation, entered into a Client Relationship Agreement pursuant to which the Foundation opened several investment accounts at UBS. Shortly thereafter, the Foundation's investment committee – which includes Appellees Cynthia T. Doyle and Mollie T. Byrnes – issued a written consent that unanimously adopted John Blair's actions in opening the Foundation's accounts at UBS and executing the UBS Client Relationship Agreement on behalf of the Foundation. For the next seven years, the Foundation lived under and benefited from the UBS Client Relationship Agreement, and nobody at the Foundation ever disputed John Blair's authority or actions.

However, now that a dispute has arisen between the Foundation and UBS, Appellees seek to disavow the very UBS Client Relationship Agreement that they previously ratified and adopted, in a misguided attempt to avoid its arbitration provision. To that end, Appellees are claiming, many years after-the-fact, that their one-time fellow trustee, John Blair, purportedly lacked authority to enter into the UBS Client Relationship Agreement in the first place. On that basis, the District Court denied Appellants' motion to compel this matter to arbitration pursuant to the terms of the UBS Client Relationship Agreement.

The District Court's decision was in error. Indeed, the Foundation's written consent ratifying and approving the UBS Client Relationship Agreement is

11

dispositive in this matter. In light of this clear and unequivocal evidence, no reasonable factfinder could find in favor of the Foundation on its newly minted argument that it did not agree to be bound by the UBS Client Relationship Agreement. Accordingly, this matter should be compelled to arbitration as a matter of law.

In addition, the record is devoid of any competent evidence that Appellants "knew or should have known" that John Blair purportedly lacked authority to bind the Foundation to the UBS Client Relationship Agreement. By giving factual weight to Appellees' conclusory allegations and speculation, the District Court strained to find disputed issues of fact where none exist. John Blair's clear, apparent authority to act on the Foundation's behalf, in his capacity as a duly appointed trustee, is an additional basis on which this matter should be compelled to arbitration as a matter of law.

Finally, the District Court's decision does not address Appellants' argument that claims to rescind an agreement, such as Appellees' here, are premised on the existence of a contract, and therefore seek to have the contract declared voidable, not void; and, as a result, such claims for rescission must go to arbitration under controlling case law. The District Court's ruling to the contrary is not supported by any reasoning, and should not stand.

In sum, the District Court erred by not enforcing the parties' arbitration agreement in accordance with controlling U.S. Supreme Court precedent that favors arbitration. Accordingly, this Court should reverse and remand with instructions to compel arbitration.

## ARGUMENT

### POINT I

### THE DISTRICT COURT ERRED IN DECLINING TO GRANT THE MOTION TO COMPEL ARBITRATION AS A MATTER OF LAW

**A.    The Foundation's Ratification and Approval Of The UBS Client Relationship Agreement Is Dispositive Of The Motion To Compel Arbitration**

Appellees contend that the UBS Client Relationship Agreement is *ultra vires* and void because John Blair allegedly lacked authority to enter into that contract and all decisions regarding the investment of the Foundation's assets needed to be approved by the Foundation's Investment Committee. JA-33 ¶¶ 119-20. Based on this allegation, the District Court ruled that there is a "triable issue of fact with respect to whether John N. Blair lacked authority to execute the Agreement." SPA-16.

Contrary to Appellees' current litigation posture, just a few weeks after John Blair executed the UBS Client Relationship Agreement, the Foundation's Investment Committee—which included two of the Appellees—expressly authorized and

13

adopted that contract. Specifically, on September 23, 2015, the Investment Committee issued the 2015 Consent which "ratified and approved" John Blair's execution of "any and all Client Services, Investment Management, Consulting Services or any and all other agreements with UBS ('UBS Agreements') as he has approved and may approve were or are appropriate for investment of the assets of the [Foundation] Accounts…." JA-943. The 2015 Consent also explicitly authorized John Blair to "make, execute and deliver the UBS Agreements[.]" JA-944.

Thus, the UBS Client Relationship Agreement was valid and binding on the Foundation either: (1) on September 3, 2015, when it was signed by John Blair based on his actual or apparent authority as a duly appointed trustee of the Foundation; or (2) twenty days later, on September 23, 2015, when the Investment Committee expressly ratified and approved that contract by issuing the 2015 Consent. JA-1032–35, JA-942–44.

Either way, Appellees cannot avoid arbitration under the UBS Client Relationship Agreement by now arguing that this contract is purportedly void *ab initio*. Through the 2015 Consent, the Foundation's Investment Committee expressly ratified and approved the UBS Client Relationship Agreement, and explicitly authorized John Blair to execute and deliver that contract to UBS. JA-943–44. Further, over the next seven years, the parties performed their respective

14

obligations under the UBS Client Relationship Agreement. JA-32 ¶ 114, JA-35 ¶ 130. UBS managed the assets in the Foundation's investment accounts, and the Foundation paid UBS investment advisory fees for those services. JA-32 ¶ 114, JA-35 ¶ 130. Appellees are estopped from seeking to disavow the very agreement that they authorized, ratified, approved and benefitted under for many years. *See American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999) ("party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause.")

As a matter of law, the Investment Committee's 2015 Consent is dispositive of the motion to compel arbitration. In light of this clear and unequivocal evidence, no reasonable factfinder could find in favor of the Foundation on its argument that it did not agree to be bound by the UBS Client Relationship Agreement, including the arbitration agreement contained therein. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 289 (1968)) ("there is no 'genuine issue for trial'" where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party" and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid disposition as a matter of law). The District Court erred in declining to compel arbitration as a matter of law, notwithstanding its finding that the 2015 Consent "ostensibly ratified

the Agreement" and "appears to be clear and unequivocal in its post hoc approval" of John Blair's execution of the UBS Client Relationship Agreement. SPA-14.[2]

## B. There Is No Competent Evidence Disputing John Blair's Apparent Authority To Bind The Foundation To The UBS Client Relationship Agreement

On the issue of John Blair's apparent authority to act on behalf of the Foundation, the District Court's decision recognized that, to defeat the motion to compel arbitration, Appellees were "required" to adduce evidence that Appellants "knew or should have known" that John Blair allegedly lacked authority to bind the Foundation to the UBS Client Relationship Agreement. SPA-13. The District Court further acknowledged in its decision that the sole proof offered by Appellees on this issue was their allegation that Jay Blair had a "longstanding involvement with the Foundation" since 2006, and the District Court held that this allegation was "thin,

---

[2] Appellants argued in their motion to compel arbitration that Appellees had ratified the UBS Client Relationship Agreement (JA-974, 1272), but Appellants did not expressly raise the 2015 Consent in their motion. The District Court nonetheless considered and addressed the 2015 Consent in its decision. SPA-5, 14–16. An issue is reviewable on appeal so long as it was "pressed or passed upon below" – *i.e.*, "it fairly appears in the record as having been raised or decided." *United States v. Harrell*, 268 F.3d 141, 146 (2d Cir. 2001). This rule operates to permit "review of an issue not pressed so long as it has been passed upon" by the court below. *United States v. Williams*, 504 U.S. 36, 41 (1992). Because the 2015 Consent is part of the record below (JA-941–44), and because the District Court clearly passed upon the 2015 Consent in reaching its decision (SPA-5, 14–16), the issue presented is reviewable by this Court.

16

but sufficient to pass muster" and "place the making of the agreement to arbitrate at issue." SPA-13. This was error.

Appellees' unsupported allegation of a longstanding relationship between Jay Blair and the Foundation does not, in any manner whatsoever, constitute admissible evidence that Appellants knew or should have known that John Blair allegedly was acting outside the scope of his authority as a duly appointed trustee of the Foundation. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("only admissible evidence need be considered by the trial court" under the summary judgment standard). While the District Court was entitled to draw all reasonable inferences in favor of Appellees as the non-moving party, it is pure speculation to conclude, based solely on an allegation of a long-standing relationship, that Appellants knew or should have known that John Blair allegedly did not have the permission of the Foundation's Investment Committee to enter into the UBS Client Relationship Agreement. *See Major League Baseball Properties, Inc. v. Salvino*, 542 F.3d 290, 310 (2d Cir. 2008) (non-moving party "does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation") (internal citations omitted).

As set forth in the record, the financial advisor team that included Jay Blair had a lengthy professional relationship with John Blair, in his capacity as a duly appointed trustee of the Foundation. JA-17 ¶ 35, JA-20 ¶¶ 49–50. This relationship

started at Smith Barney/Morgan Stanley, where the Foundation's investment accounts were previously managed, and then this relationship continued when the advisor team moved to UBS, and John Blair caused the Foundation's investment accounts to be transferred from Smith Barney/Morgan Stanley to UBS. JA-17 ¶ 35, JA-20 ¶¶ 49–50.

Further, in connection with the opening of the Foundation's investment accounts at UBS, John Blair expressly represented to UBS, among other things, that: (i) "I acknowledge and agree with the terms and conditions of the UBS Client Relationship Agreement"; and (ii) "As trustee, I have full power under the trust agreement to make this Trust Certification and to submit valid orders and other instructions on behalf of the trust." JA-1032–35. "A person other than a beneficiary", such as UBS, "who in good faith deals with a trustee is not required to inquire into the extent of the trustee's powers or the propriety of their exercise." Uniform Trust Code at §1012.

Thus, the record confirms that, when John Blair represented to Appellants in September 2015 that he was authorized to enter into the UBS Client Relationship on behalf of the Foundation, he had apparent, if not actual, authority to do so. JA-20 ¶ 54, JA-21 ¶ 56.) *See Telenor Mobile Commc'ns AS v. Storm LLC,* 584 F.3d 396, 411 (2d Cir. 2009), quoting *Masuda v. Kowasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964) ("Under New York law, an agent has apparent authority if 'a principal

places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess.'") The 2015 Consent that the Foundation's Investment Committee issued twenty days later confirms (i) that there is no genuine issue of fact concerning John Blair's authority at that time to act behalf of the Foundation, and (ii) that the members of the Investment Committee, including two of the Appellees, had no objection to the actions taken by John Blair. JA-941–44.

By giving factual weight to Appellees' conclusory allegations and speculation, the District Court strained to find disputed issues of fact where none exist, in contravention of the "emphatic federal policy in favor of arbitral dispute resolution." *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012). Because there is no competent evidence in the record that Appellants knew or should have known that John Blair allegedly acted outside the scope of his authority as trustee, the District Court erred by not enforcing the parties' arbitration agreement in accordance with controlling U.S. Supreme Court precedent that favors arbitration. *See, e.g., Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 215 (1985) (district court erred in denying motion to compel arbitration of claims that were subject to arbitration provision in financial firm's standard "Customer's Agreement"); *Rodriguez de Quijas v Shearson/American Exp, Inc.*, 490 U.S. 477, 478 (1989) (affirming grant of motion to compel arbitration pursuant to "standard customer agreement with the broker" requiring arbitration of any controversies relating to

19

customer's accounts); *Shearson/American Exp, Inc. v. McMahon*, 482 U.S. 220, 222 (1987) (compelling arbitration of claims and recognizing the "enforceability of predispute arbitration agreements between brokerage firms and their customers").

## POINT II

### ALTERNATIVELY, THE DISTRICT COURT ERRED IN RULING THAT THE VALIDITY OF THE ARBITRATION AGREEMENT SHOULD BE DETERMINED BY THE DISTRICT COURT, NOT THE ARBITRATOR

Assuming, *arguendo*, that there are genuine issues of disputed fact concerning the validity of the parties' arbitration agreement, the District Court erred in ruling that Appellees have adequately alleged that the UBS Client Relationship Agreement is "void *ab initio*, not merely voidable" such that the "validity of the Agreement" is an "issue for trial" before the District Court, not the arbitrator. SPA-14, 8.

The District Court's decision relies heavily on *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26 (2d Cir. 2001). Such reliance, however, is misplaced. As an initial matter, *Sphere Drake* notes that:

> A void contract is one that produces no legal obligation. *See* Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 1:20, at 49 (4th ed.1990). Such contracts are rare: "Illustrations of agreements that are wholly void of legal effect are not very numerous...."

263 F.3d at 31.

*Sphere Drake* was "a declaratory judgment action, seeking to have the contracts declared void . . . ." *Id.* at 27.  However, that is <u>not</u> Appellees' claim here.

Appellees' claims in this action are twofold.  First, Appellees seek "RESCISSION OF THE UBS ADVISORY AGREEMENT AND RESTITUTION OF FEES" based on alleged violations of the Investment Advisers Act.  JA-32–34 ¶¶ 110–130.  Appellees' decision to seek rescission under a federal securities statute was a strategic one.  They are seeking rescission of the UBS Client Relationship Agreement, as opposed to a declaratory judgment that it is void, because Plaintiffs want a remedy that is only available through rescission under the Investment Advisers Act – *i.e.*, restitution of the management fees that the Foundation paid to UBS.  JA-35 ¶ 130.

Second, in their other Counts, Appellees seek monetary damages based on "lost profits" and "loss of investment opportunity" for breach of fiduciary duty and negligence.  JA-42 ¶ D.  But, these are remedies that are based on the agreement that Appellees are seeking to avoid.  Thus, although Appellees are now arguing that the agreement is void, they are seeking relief against Appellants based on the obligations imposed by the agreement.  Appellees cannot have it both ways.  As this Court held in *Sphere Drake*:

> Unlike a void contract, a voidable contract is an agreement that '[u]nless ***rescinded*** . . . imposes on the parties the same obligations as if it were not voidable.'

21

263 F.3d at 31 (quoting 1 Williston, § 1:20, at 50) (emphasis added). Here, Appellees are seeking damages based on the imposition on Appellants of the same obligations as if there was an agreement, and then alleging that Appellants breached those obligations. JA-32–39 ¶¶ 110–155, JA-40–41 ¶¶ 165–177. That is a voidable contract.

Indeed, the *Sphere Drake* Court expressly distinguished the plaintiff's claim for a declaratory judgment from a claim for rescission, finding that the plaintiff's declaratory judgment claim sought to have the subject contracts declared "void", while a rescission claim is different and seeks to have a contract declared "voidable." 263 F.3d at 31. In the present matter, the case for voidability is even more compelling since Appellees are seeking monetary damages based on the very agreement they are now arguing is void. The *Sphere Drake* Court recognized that claims, such as Appellees' here, to rescind a voidable contract must go to arbitration "unless the party alleges that the arbitration clause itself is voidable and provides some evidence in support of its allegation." *Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–04 (1967)). There is no attack on the arbitration provision itself here.

A year after *Sphere Drake*, this Court reiterated in *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.* that a rescission claim seeks to have the contact declared voidable, not void:

> [B]y consistently arguing that the Agreement should be
> rescinded on the basis of fraud, [the plaintiff] has
> conceded that the Agreement is, at most, voidable.

307 F.3d 24, 29 (2d Cir. 2002) (citing *Sphere Drake*, 263 at F.3d at 26) (Sotomayor,

CJ). The *Ace Capital* Court further held that because the plaintiff's challenge was

not "directed specifically to the arbitration clause", but instead attacked the validity

of "the entire Agreement", as Appellees do in this action, the claim was not

"precluded from arbitration". *Id.* at 30.

Here, Appellees' claim is for rescission of the UBS Client Relationship

Agreement (JA-32–35 ¶¶ 110–130), which means that they are seeking to have that

contract declared voidable, not void, under the distinction highlighted in *Sphere

Drake* and *Ace Capital*. Because Appellees' recission claim attacks the UBS Client

Relationship Agreement as a whole and does not challenge the arbitration provision

itself (JA-32-35 ¶¶ 110–130), the validity of the UBS Client Relationship

Agreement must go to arbitration. *See Ace Capital*, 307 F.3d at 29 ("[U]nder the

rule of *Prima Paint*, if a party merely alleges that a contract is voidable, then, for the

party to receive a trial on the validity of the arbitration clause, the party must

specifically allege that the arbitration clause is itself voidable.")

Federal courts have held that claims for rescission, including claims like

Appellees' under the Investment Advisers Act, are for the arbitrator to decide where

they do not specifically challenge the arbitration provision. *See Mitsubishi Motors*

23

*Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) (rescission claim under a federal statute should be submitted to arbitration because, "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function"); *Preston v. Ferrer*, 552 U.S. 346, 354 (2008) (claim to void contract based on alleged violations of California's Talent Agencies Act was required to be submitted to arbitrator because it "sought invalidation of the contract as a whole" and "made no discrete challenge to the validity of the arbitration clause"); *see also Levin v. Alms and Associates, Inc.*, Civil Action No. MJG-09-3403, 2010 WL 11545691, * 4 (D. Md. July 22, 2010), *rev'd on diff. grounds* 634 F.3d 260 (4th Cir. 2011) (compelling arbitration of claim to rescind advisory agreement under the Investment Advisers Act and noting that "[t]here is nothing in the 2007 Arbitration Clause that limits the arbitrator's ability to rescind the agreement or award restitution" and that "arbitrators may grant whatever remedy is necessary to right their wrongs within their jurisdiction.")

## POINT III

## ALTERNATIVELY, THE DISTRICT COURT ABUSED ITS DISCRETION BY NOT SETTING AN EVIDENTIARY HEARING TO DECIDE THE <u>ISSUE OF ARBITRABILITY</u>

In its decision, the District Court references "triable issues of fact" and holds that Appellees have presented "sufficient evidence to place the validity of the Agreement at issue for trial." SPA-8, 11, 16.

When denying a motion to compel arbitration based on disputed issues of fact, district courts typically set an evidentiary hearing to decide the issue of arbitrability before proceeding with the merits of the case. *See, e.g., Operative Plasterers & Cement Masons Int'l Assoc. v. Int'l Brotherhood of Painters and Allied Traders*, 954 F.Supp. 563, 567 (E.D.N.Y. 1997) (the court "must make an independent determination on the arbitrability issue" and "[c]ounsel for the parties are hereby ordered to appear for a hearing on this issue on February 10, 1997 at 10:00 a.m."); *National Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Systems, LLC*, 289 F.Supp.3d 457, 468 (S.D.N.Y. 2018) (the "motions will be resolved following an evidentiary hearing" and "[t]he parties are instructed to meet and confer and submit to the Court a proposed schedule for the hearing"); *Dun Shipping Ltd. v. Amerada Hess Shipping Corp.*, 234 F.Supp.2d 291, 296–97 (S.D.N.Y. 2002) ("The matter is referred to Magistrate Judge Fox for (i) the purpose of scheduling limited discovery as outlined above and (ii) for revisiting the issue of arbitrability by hearing or upon

25

submission in light of such discovery"); *Gudge v. 109 Restaurant Corp.*, 118 F.Supp.3d 543, 548 (E.D.N.Y. 2015) ("Defendants' motion to compel arbitration is denied, without prejudice to renew following a hearing on whether the parties agreed to arbitrate").

Thus, assuming, *arguendo*, that the District Court appropriately denied Appellants' motion to compel arbitration based on a question of fact as to the validity of the arbitration agreement, the District Court nonetheless abused its discretion by not setting an evidentiary hearing. SPA-1–17. In the absence of any evidentiary hearing, Appellants will be forced to proceed with the merits of the case before the issue of arbitrability is decided, thereby frustrating "the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 977 (2d Cir. 1974).

Accordingly, if the denial of the motion to compel is not reversed, this matter should be remanded to the District Court with instructions to schedule an evidentiary hearing to decide the issue of arbitrability.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse and remand with instructions to compel arbitration.

Dated: June 17, 2024

Joshua S. Bratspies, Esq.
**SHERMAN ATLAS SYLVESTER &**
  **STAMELMAN LLP**
1185 Avenue of the Americas, 3rd Floor
New York, New York 10036
(212) 763-6464
jbratspies@shermanatlas.com

-and-

Terrance P. Flynn, Esq.
**HARRIS BEACH PLLC**
726 Exchange Street, Suite 1000
Buffalo, NY 14210
(716) 200-5050
tflynn@harrisbeach.com

*Attorneys for Defendants/Appellants*
*UBS Financial Services Inc. and Jay S. Blair*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of June 2024, a true and correct copy of the foregoing Appellant's Opening Brief was serviced on the following counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(cv)(2).

James P. Milbrand
Barclay Damon LLP
The Avant Building
200 Delaware Avenue, Suite 1200
Buffalo, NY 14202

Brian Whitely
Barclay Damon LLP
160 Federal Street, 10th Floor
Boston, MA 02110

Date: June 17, 2024                         Joshua S. Bratspies

# SPECIAL APPENDIX

**i**

**SPECIAL APPENDIX**

**TABLE OF CONTENTS**

**Page**

Decision and Order of the United States District Court
  for the Western District of New York, filed
  February 23, 2024, Appealed From .......................... SPA-1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CYNTHIA T. DOYLE, MOLLIE T. BYRNES, JAMES
WEISS AND DAVID WELBOURN, IN THEIR
CAPACITIES AS TRUSTEES OF THE PETER AND
ELIZABETH C. TOWER FOUNDATION,

                                        Plaintiff,          Case No. 6:22-CV-276-FPG

v.                                                          DECISION AND ORDER

UBS FINANCIAL SERVICES, INC., JAY S. BLAIR,
and JOHN N. BLAIR,

                                        Defendants.

## INTRODUCTION

Plaintiffs Cynthia T. Doyle, Mollie T. Byrnes, James Weiss and David Welbourn ("Plaintiffs"), in their capacities as trustees of the Peter and Elizabeth C. Tower Foundation (the "Foundation"), bring this action against Defendants UBS Financial Services, Inc. ("UBS"), Jay S. Blair, and John N. Blair (collectively, "Defendants"), alleging violations of the Investment Advisers Act of 1940, 25 U.S.C. § 80b-1 *et seq*. (the "Act") and New York law. *See* ECF No. 1. Plaintiffs allege, *inter alia*, that UBS and Jay S. Blair breached their fiduciary duties to the Foundation in violation of the Act by failing to conduct due diligence with respect to John N. Blair's authority to maintain the Foundation's investment advisory accounts, and that John N. Blair "aided and abetted" that failure in violation of New York law. *Id*. Plaintiffs seek rescission of the investment advisory agreement UBS and Jay S. Blair executed with John N. Blair, restitution of all payments made pursuant to the agreement, compensatory damages, punitive damages, and attorneys' fees and costs. *Id*. at 24.[1]

---

[1] On May 11, 2022, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction. ECF No. 5. On May 20, 2022, the parties stipulated to an extension of Defendants' time to respond to Plaintiffs' motion *sine die*, or indefinitely, which the Court adopted on May 24, 2022. ECF Nos. 17, 19.

SPA-2

Plaintiffs allege that John N. Blair abused his authority as Attorney Trustee of the Foundation in connection with his management of the Foundation's investment advisory accounts. *Id*. As alleged, John N. Blair improperly caused the investment firm with which his son, Jay S. Blair, was affiliated to be appointed investment adviser of the Foundation and improperly transferred the Foundation's investment accounts to Morgan Stanley after Morgan Stanley purchased the firm with which Jay S. Blair was associated. *Id*. at 8-11. In addition, Plaintiffs allege John N. Blair improperly terminated Morgan Stanley and transferred the Foundation's investment accounts to UBS after Jay S. Blair and his team moved from Morgan Stanley to UBS. *Id*. at 12

On July 1, 2022, pursuant to the *Colorado River* abstention doctrine and Federal Rule of Civil Procedure 12(b)(6), John N. Blair moved to dismiss or stay Plaintiffs' complaint. ECF No. 22. On July 29, 2022, UBS and Jay S. Blair joined in John N. Blair's motion to dismiss and filed a brief to supplement the motion. ECF No. 25. On July 29, 2022, Plaintiffs responded. ECF No. 26. On August 12, 2022, John N. Blair replied. ECF No. 29. On January 26, 2023, the Court denied Defendants' motion to dismiss. ECF No. 31.

On March 10, 2023, UBS and Jay S. Blair (hereinafter, "Defendants"), moved to compel arbitration. ECF No. 31. On March 14, 2023, John N. Blair answered Plaintiffs' complaint. ECF No. 41. On April 7, 2023, Plaintiffs responded to Defendants' motion, ECF No. 44, and on April 21, 2023, Defendants replied. ECF No. 45. For the reasons set forth below, Defendants' motion to compel arbitration is denied.

## BACKGROUND

The Foundation, a $147 million charitable trust, was created by Peter and Elizabeth C. Tower in the 1990s to support community organizations that serve children with learning

disabilities, mental health issues, and substance use disorders.  ECF No. 1 at 6.  From 2006 until 2020, John N. Blair served as Attorney Trustee of the Foundation and as a member of the Foundation's Operations and Investment Committees.  *Id*. at 5.  Blair was a voting member of each committee, along with Plaintiffs Doyle and Byrnes, daughters of Peter and Elizabeth.  *Id*. at 8.

In May 2006, pursuant to the Amendment and Restatement of the Original Indenture dated May 9, 2006 (the "Fourth Indenture"), John N. Blair was appointed to the position of Attorney Trustee and became a member of the Investment Committee.  *Id*. at 7-8.  On August 2, 2006, the Investment Committee adopted a "Statement of Unanimous Consent in Lieu of Meeting of Voting Members of the Investment Committee" which authorized John N. Blair to "take any and all actions and execute any and all authorizations, instruments, documents and related material in connection with: 1. Writing Checks; 2.  Directing the transfer, deposit, investment or disbursement of funds or other assets of the Foundation including […] all transactions to and from any and all accounts of the Foundation maintained at M&T Bank, Charles Schwab, Vanguard, Deutsche Bank and/or any successor account and/or new accounts at any banking or other financial institution[.]"  *Id*. at 9; ECF No. 1-7 (the "2006 Consent").  In connection with the 2006 Consent, John N. Blair transferred the Foundation's investments to Smith Barney, an investment firm which was affiliated with the Arthurs Malof Group, Jay S. Blair's employer.  ECF No. 1 at 9.  Jay S. Blair is John Blair's son.

In May 2007, the Board of the Foundation implemented a Conflict of Interest Policy and a Self-Dealing Policy.  *Id*. at 9-10; *see* ECF Nos. 1-8 (the "Conflict of Interest Policy"), 1-9 (the "Self-Dealing Policy").  The Conflict of Interest Policy provided that "[b]efore participating in any action or decision of the Foundation affecting any organization of which or in which a Foundation Trustee or employee, or any member of his or her family, is an officer, director, trustee

3

or employee or holds another responsible position, such person shall disclose such fact to the Board." ECF No. 1-8 at 2.  The Self-Dealing Policy provided that the "Foundation may not engage in any financial transaction with any Trustee or Foundation employee, except for the reimbursement of reasonable expenses incurred in carrying out the purposes of the Foundation and reasonable compensation for personal services rendered to the Foundation."  ECF No. 1-9 at 2.  The policy further provided that the "Foundation shall not engage in any transaction that will result in any material financial or personal benefit to any Trustee or Foundation employee." *Id.*

The Investment Committee was "vested exclusively" with the "investment and management of the assets of the Foundation[,]" under the Seventh Amended and Restated Trust Indenture, and was governed by the Investment Committee Charter, which the voting members of the committee adopted on December 4, 2008.  *See* ECF No. 1-3 at 10 (the "Seventh Indenture"); *see also* ECF No. 1-10 (the "Charter").  The Charter provided that the "Investment Committee will be responsible for the investment and management of the assets of the Foundation[,]" and that "[a]ction of the Investment Committee shall require the vote or written consent (manual or electronic) of a majority of the voting Members of the Investment Committee except that unanimous vote or written consent of all of the voting members of the Investment Committee shall be required to amend, modify, change or waive any provisions of the Investment Policy Statement and/or the Investment Committee Charter." ECF No. 1-10 at 3.  In addition, the Charter provided that the "Investment Committee shall have the power to retain and compensate one or more advisors to assist the Investment Committee in performing its responsibilities." *Id.*

In 2009, Morgan Stanley purchased Smith Barney, causing Arthurs Malof to become affiliated with Morgan Stanley.  ECF No. 1 at 11.  John N. Blair transferred the Foundation's

investment advisory accounts to Morgan Stanley.  *Id.*  In 2015, the Arthurs Malof Group, led by Jay S. Blair, moved from Morgan Stanley to UBS.  *Id*. at 11-23.

On September 3, 2015, John N. Blair executed a Client Relationship Agreement (the "Agreement") with UBS in his capacity as Attorney Trustee, transferring the Foundation's assets and brokerage accounts from Morgan Stanley to UBS.  *Id*. at 12-14; ECF Nos. 39-3, 39-4 (signature pages to the Agreement).  The Agreement provided for arbitration before FINRA of "any controversy, claim or issue in any controversy that may arise … including but not limited to controversies, claims or issues in any controversy concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement."  ECF No. 39-3 at 42.  The Agreement further provided that the parties "are giving up the right to sue each other in court including the right to a trial by jury" and that "any arbitration under this Agreement shall be governed by the Federal Arbitration Act."  *Id*.  On the signature pages to the Agreement, John N. Blair marked "Yes" to a query as to whether "one trustee or officer [can] act independently …" "[i]f the trust has multiple trustees or officers," and, in signing the Agreement, indicated that as a trustee he had "full power under the trust agreement to make [the] Trust Certification and to submit valid orders and other instructions on behalf of the trust."  ECF No. 39-4 at 4.

On September 23, 2015, the Investment Committee adopted a "Statement of Unanimous Written Consent in Lieu of Meeting[,]" (the "2015 Consent") which "ratified and approved" John N. Blair's execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the Tower Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair[.]" ECF No. 1-16 at 3.  The 2015 Consent further authorized John N. Blair to "make, execute and deliver the UBS Agreements[.]"  *Id*. at 4.

5

SPA-6

In June 2020, Plaintiffs Doyle and Byrnes, two of the three voting members of the Investment Committee, initiated the process of selecting an alternative investment advisor to replace UBS.  ECF No. 1 at 15.  In September 2020, a majority of the Investment Committee voted to terminate UBS and retain Wilmington Trust Investment Advisors, Inc. as the Foundation's investment advisor.  *Id*. at 16; ECF No. 1-5 at 584.  John N. Blair voted against such action, and objected to the transfer.  ECF No. 1 at 16.

In November 2020, John N. Blair was removed as Attorney Trustee, after the Board of the Foundation adopted a resolution entitled "Unanimous Vote of the Disinterested Trustees of the Peter and Elizabeth C. Tower Foundation to Remove John N. Blair as Attorney Trustee."  ECF No. 1-5 at 2.  In January 2020, John N. Blair brought an action in Erie County Surrogate's Court challenging *inter alia* his removal in Erie County Surrogate's Court and seeking construction of the Foundation's governing documents to confirm the extent of his authority as Attorney Trustee. *See Doyle v. UBS Fin. Servs., Inc*., No. 6:22-CV-276-FPG, 2023 WL 424488, at *1 (W.D.N.Y. Jan. 26, 2023); *see also Matter of P. & E. T. Found*., 167 N.Y.S.3d 270, 271 (4th Dept. 2022), *rearg. denied*, 168 N.Y.S.3d 925 (2022).

On April 11, 2022, Plaintiffs brought the present action against Defendants UBS, Jay S. Blair, and John N. Blair.  ECF No. 1.  Plaintiffs (i) seek rescission of the investment advisory agreement John N. Blair executed with UBS as Attorney Trustee; (ii) allege that UBS and Jay S. Blair breached their fiduciary duties of care and loyalty to the Foundation under the Investment Advisers Act of 1940; (iii) allege that John N. Blair aided and abetted such breach under New York law; and (iv) allege negligence against UBS and Jay S. Blair.  *Id*. at 24.

**LEGAL STANDARD**

Defendants contend that Plaintiffs' claims are subject to arbitration, and accordingly request an order compelling arbitration pursuant to the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 2-4.   Pursuant to the FAA, "[a] written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … or an agreement in writing to submit to arbitration an existing controversy arising out of … a contract … shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  "The FAA reflects a liberal federal policy favoring arbitration agreements, and places arbitration agreements on the same footing as other contracts." *Meyer v. Uber Techs.*, 868 F.3d 66, 73 (2d Cir. 2017) ( internal quotations and citations omitted). When deciding whether an action should be arbitrated, "first, [the Court] must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable […]."  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004).

"The question of whether the parties have agreed to arbitrate, i.e., the 'question of arbitrability,' is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83 (2002)).  "[T]he summary judgment standard is appropriate in cases where the District Court is required to determine arbitrability, regardless of whether the relief sought is an order to compel arbitration or to prevent arbitration." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  Because the summary judgment standard is appropriate, "materials outside the pleadings may be considered."  *Lobban v. Cromwell Towers Apartments, Ltd. P'ship*, 345 F. Supp. 3d 334, 342 (S.D.N.Y. 2018); *see also Meyer*, 868 F.3d at 74 (on a motion to compel arbitration, "the court consider[s] all relevant, admissible

7

SPA-8

evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with … affidavits, and draws all reasonable inferences in favor of the non-moving party." (alterations in original) (quotation and citation omitted)).

## DISCUSSION

Defendants move to compel arbitration on the basis that (i) an arbitration provision in the Agreement mandates that Plaintiffs claims should be submitted to arbitration and that (ii) such claims must be arbitrated before FINRA.  ECF No. 39-1 at 10.  Plaintiffs contend that arbitration cannot be compelled on three grounds: (i) the Agreement containing the arbitration provision was void *ab initio* because Defendant John N. Blair lacked authority to bind the Foundation to the Agreement; (ii) FINRA is not the appropriate forum; and (iii) Defendants waived their right to arbitrate by participating in this action.  ECF No. 44 at 10-23.  For the reasons below, the Court agrees that arbitration cannot be compelled under Plaintiffs' first argument.  Because the Court denies Defendants' motion under Plaintiffs' first argument, the Court does not address the parties' remaining arguments.

### A. Arbitrability

As stated, Defendants move to compel arbitration under the FAA, arguing first that the Agreement is valid and enforceable.  ECF No. 39-1 at 12-14.  Plaintiffs argue that the Agreement was void *ab initio* because John N. Blair lacked actual or apparent authority to bind the Foundation to the Agreement, and Defendants knew or should have known this.  ECF No. 44 at 16-18.  For the reasons below, the Court concludes that Plaintiffs present sufficient evidence to place the validity of the Agreement at issue for trial.  Accordingly, Defendants' motion is denied.

As a general matter, when "the making of the agreement to arbitrate is placed in issue …

the court must set the issue for trial," so long as "the party putting the agreement to arbitrate in

issue ... present[s] 'some evidence' in support of its claim." S*phere Drake Ins., Ltd. v. Clarendon

Nat'l Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) (quoting *Interocean Shipping Co. v. Nat'l Shipping &

Trading Corp.*, 462 F.2d 673, 676 (2d Cir.1972)).  Indeed, "[i]f there is a disputed question of

material fact, such that "the making of the arbitration agreement ... [is] in issue," then "the court

shall proceed summarily to the trial thereof."  9 U.S.C. § 4; *see Bensadoun v. Jobe-Riat*, 316 F.3d

171, 175 (2d Cir. 2003).  "Depending on the type of claimed inarbitrability," a party might also be

"required to make a specific challenge to the arbitration clause." *Telenor Mobile Commc'ns AS v.

Storm LLC*, 584 F.3d 396, 407 (2d Cir. 2009); *see Sphere Drake*, 263 F.3d at 31-32 (noting that in

setting an arbitrability issue for trial, a party alleging that a contract is void need not challenge the

arbitration clause, but a party alleging that a contract is voidable must challenge the arbitration

clause in particular).[2]

Where parties are bound to an arbitration agreement, courts favor arbitration as a form of

dispute resolution.  *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022); *see* 9 U.S.C. §

2; *see also New York v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996).  "But on the

antecedent question of whether the parties actually agreed to arbitration (that is, whether an

arbitration agreement between them exists at all)," courts show no such special solicitude.

*Barrows*, 36 F.4th at 50 (citing *Opals on Ice Lingerie v. Bodylines Inc*., 320 F.3d 362, 369 (2d Cir.

2003).  Courts resolve such agreement-formation questions by applying the law of the state at

---

[2] Defendants' reliance on *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) is misplaced.  *See* ECF No. 39-1 at 13-14 ("the validity of the Client Relationship Agreement must go to the arbitrator.").  While *Buckeye* held that an arbitration provision may in some circumstances be severable from an agreement otherwise challenged as void, *Buckeye* expressly stated that it "does not speak to the issue decided in cases […] which hold that it is for courts to decide whether the alleged obligor ever signed the contract [or] *whether the signor lacked authority to commit the alleged principal*." *Buckeye*, 546 U.S. at 444 n. 1 (emphasis added).  This action presents the latter question.

issue.  *Id*. (citing *Schnabel v. Trilegiant Corp*., 697 F.3d 110, 119 (2d Cir. 2012)).  "Under New York law, parties that have not agreed to arbitrate claims may not be forced to do so."  *Id*. (citing *TNS Holdings, Inc. v. MKI Sec. Corp*., 92 N.Y.2d 335 (1998); *Marlene Indus. Corp. v. Carnac Textiles, Inc*., 45 N.Y.2d 327 (1978)).

To that end, "[i]f an agent that has been charged with negotiating a contract on behalf of the principal acts outside the scope of its agency, and the opposing party knows this, then the agent lacks both actual and apparent authority, and the principal is not bound to the contract, for the contract is void—it never came into legal existence."  *Sphere Drake*, 263 F.3d at 32 (citing *Scientific Holding Co. v. Plessey Inc*., 510 F.2d 15, 24 (2d Cir. 1974)).

"Under New York law, an agent has apparent authority if 'a principal places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess.'"  *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009) (quoting *Masuda v. Kawasaki Dockyard Co*., 328 F.2d 662, 665 (2d Cir. 1964)); *see, e.g., Warnock Cap. Corp. v. Hermitage Ins. Co*., 21 A.D.3d 1091 (2d Dep't 2005).  Actual authority "is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him."  *Dinaco, Inc. v. Time Warner, Inc*., 346 F.3d 64, 68 (2d Cir. 2003) (quoting *Minskoff v. Am. Express Travel Related Servs. Co*., 98 F.3d 703, 708 (2d Cir. 1996)).

In sum, "[i]f a party alleges that a contract is void and provides *some evidence* in support, then […] the party is entitled to a trial on the arbitrability issue […]."  *Sphere Drake*, 263 F.3d at 32 (emphasis added).  Here, Plaintiffs allege that the Agreement was void *ab initio* because John N. Blair was not authorized to bind the Foundation to it.  *See* ECF No. 1 at 12-14; ECF Nos. 39-3, 39-4; ECF No. 44 at 16-18.  Accordingly, to defeat Defendants' motion, Plaintiffs must present

"some evidence … to substantiate [their] denial" that an agreement had been made.  *Barrows*, 36 F. 4th at 50 (citing *Interocean*, 462 F.2d at 676 (2d Cir. 1972) (to create a genuine issue for trial, a nonmovant must make an unequivocal denial and substantiate it with some evidence)); *accord Sphere Drake*, 263 F.3d at 30.

At this stage of litigation, and "draw[ing] all reasonable inferences in favor of the non-moving party[,]" the Court concludes that Plaintiffs present sufficient evidence to substantiate their denial of the Agreement's validity.  *Meyer*, 868 F.3d at 74.  A triable issue exists as to whether John N. Blair lacked actual and apparent authority to execute the Agreement at the time of its execution, and whether Defendants knew or should have known this.  *See Sphere Drake*, 263 F.3d at 32.  To substantiate their denial, Plaintiffs rely primarily upon the terms of the Seventh Indenture and the Investment Committee Charter, the latter of which the voting members of the committee adopted on December 4, 2008.  *See* ECF No. 1-3 at 10 (the "Seventh Indenture"); *see also* ECF No. 1-10 (the "Charter").  As stated, the Seventh Indenture provided broadly that the Investment Committee was "vested exclusively" with the "investment and management of the assets of the Foundation[,]" and the Charter likewise provided that the "Investment Committee will be responsible for the investment and management of the assets of the Foundation[,]" and "[a]ctions of the Investment Committee shall require the vote or written consent (manual or electronic) of a majority of the voting Members of the Investment Committee […]."  ECF No. 1-10 at 3.  The Charter additionally stated that the "Investment Committee shall have the power to retain and compensate one or more advisors to assist the Investment Committee in performing its responsibilities."  *Id*.

While the 2006 Consent, as discussed, appears to have authorized John N. Blair's execution of an investment relationship with Smith Barney, then-affiliate of Jay S. Blair, Plaintiffs argue that

11

the Charter "superseded" the 2006 Consent such that any authority bequeathed to John N. Blair under the 2006 Consent was abrogated, and that Defendants knew or should have known this. ECF No. 1 at 13. Specifically, the 2006 Consent authorized John N. Blair to, in pertinent part, "take any and all actions and execute any and all authorizations, instruments, documents and related material in connection with […] [d]irecting the transfer, deposit, investment or disbursement of funds or other assets of the Foundation including […] all transactions to and from any and all accounts of the Foundation maintained at M&T Bank, Charles Schwab, Vanguard, Deutsche Bank and/or any successor account and/or new accounts at any banking or other financial institution[.]" ECF No. 1-7. The 2006 Consent and the Charter, adopted in 2008, each include broad terms authorizing John N. Blair and the Investment Committee, respectively, to take a range of investment-related actions in a manner which appears to be in conflict, such that a reasonable trier of fact could conclude that John N. Blair lacked authority to bind the Foundation to the Agreement when he independently executed it on September 3, 2015. A reasonable trier of fact may, for instance, conclude that the Charter exclusively authorized the Investment Committee to oversee investment actions in a manner which precluded John N. Blair's execution of the Agreement. *See* ECF No. 1-10. Likewise, a jury could conclude that the 2006 Consent was intended only to authorize John N. Blair to "write checks" and transfer funds subject to the Investment Committee's approval. ECF No. 1-7 (authorizing Attorney Trustee to take any and all actions […] in connection with […] writing checks). Such questions, and the express terms of the 2006 Consent and Charter, suffice to place the "making of the agreement to arbitrate" at issue, and suggest that the Court must "set the issue for trial." *Sphere Drake*, 263 F.3d at 32. Whether the Charter in fact superseded the 2006 Consent, as Plaintiffs contend, constitutes a genuine dispute of material fact as to the extent of John N. Blair's authority to execute the Agreement on the Foundation's behalf.

While John N. Blair's representation that he was authorized to act independently when executing the Agreement, *see* ECF No. 39-4 at 4 (Attorney Trustee indicating that he has full power to execute agreement), hints at a finding that he possessed apparent authority to execute the Agreement, it is well-settled that an agent has apparent authority only if the "*principal* places [the] agent in a position where it appears that the agent has certain powers which he may or may not possess." *Telenor Mobile Commc'ns AS*, 584 F.3d at 411 (emphasis added) (internal quotation marks omitted).  Here, Defendants do not present sufficient evidence to suggest that the principal, the Foundation, placed John N. Blair, its agent, in such a position prior to the execution of the Agreement on September 3, 2015.  Defendants appear to cite only the 2006 Consent for support, which, as Plaintiffs adequately allege, may have been superseded by the Charter in 2008.  Without more, the Court cannot conclude that John N. Blair had apparent authority to execute the Agreement.

With respect to whether Defendants knew or should have known of this, as is required, the evidence adduced by Plaintiffs is thin, but sufficient to pass muster under *Barrows* and *Sphere Drake*.  Plaintiffs allege that Jay S. Blair's involvement with the Foundation since 2006 amounts to "some evidence" that he and UBS knew or should have known John N. Blair may have lacked authority to bind the Foundation to the Agreement.  *See* ECF No. 44 at 18-19.  The Court finds that Plaintiffs' allegations, which are largely undisputed, as to Jay S. Blair's longstanding involvement with the Foundation over approximately nine years prior to the execution of the Agreement are sufficient to place the making of the agreement to arbitrate at issue.  *See Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019) ("[P]laintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact.");  *see also Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) ("[W]hen an agent is employed to represent a principal with respect

13

to a given matter and acquires knowledge material to that representation, for purposes of assessing the principal's rights and liabilities vis-à-vis a third person the agent's knowledge is imputed to the principal.").

The 2015 Consent, which ostensibly ratified the Agreement, looms large over this discussion, but ultimately does not disturb the Court's conclusion that Plaintiffs have adequately alleged, at this stage, that the Agreement was void *ab initio*. As stated, the 2015 Consent, which was adopted by the Investment Committee (which included Plaintiffs Doyle and Byrnes) twenty days after John N. Blair executed the Agreement with UBS, expressly "ratified and approved" the Agreement. ECF No. 1-16 at 3. Specifically, the 2015 Consent approved John N. Blair's prior execution of documents "so that all investment advisory, consulting, brokerage, custodian services with respect to the assets and investments of the Tower Accounts be provided by [UBS] under such Client and/or Investment Management Agreements approved by John N. Blair[.]" *Id*. The 2015 Consent further authorized John N. Blair to "make, execute and deliver the UBS Agreements[.]" *Id*. at 4. The 2015 Consent, which appears to be clear and unequivocal in its post hoc approval of John N. Blair's purportedly brazen and unauthorized actions, ultimately does not impact the Court's arbitrability determination. While the 2015 Consent may constitute evidence from which a trier of fact may determine the extent of John N. Blair's authority and liability at trial, for the purposes of the present motion, Plaintiffs need only present "some evidence … to substantiate [their] denial" that an agreement had been made. *Barrows*, 36 F. 4th at 50. As discussed, that burden has been met. Moreover, though Defendants do not raise it, the Court need not address a possible ratification defense stemming from the consent because such a defense is

(i) foreclosed by Federal Rule of Civil Procedure 8(c) at this juncture, and (ii) ostensibly inapplicable to contracts which are adequately alleged to be void, as explained below.[3]

First, Federal Rule of Civil Procedure 8(c) provides: "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." "The rule is intended to notify a party of the existence of certain issues, and its mandatory language has impelled [the Second Circuit] to conclude that a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation." *Doubleday & Co. v. Curtis*, 763 F.2d 495, 503 (2d Cir. 1985) (citing *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984). "Ratification is an affirmative defense within the purview of that rule." *Principal Life Ins. Co. v. Locker Grp*., 869 F. Supp. 2d 359, 366 (E.D.N.Y. 2012) (citing *Spyder Enters., Inc. v. Ward*, 872 F. Supp. 8, 13 (E.D.N.Y. 1995) (defendant "never asserted a ratification defense in his pleadings, and as that is an affirmative defense, he was bound to have given notice of his intention to assert this defense in his pleadings.").

Defendants do not expressly or impliedly assert ratification in the present motion or reply brief, nor did they in their supplemental brief brought in connection with the Defendant John N. Blair's prior motion to dismiss. *See e.g*., ECF Nos. 25, 39, 45. Compelling arbitration, and dismissing Plaintiffs' claims as to Defendants, "based on an issue never pleaded by [Defendants]— or even implicitly raised […]—is inconsistent with the due process concerns of adequate notice and an opportunity to be heard." *Doubleday & Co*., 763 F.2d at 502 (explaining that "such a result runs counter to the spirit of fairness embodied in [Rule 8(c)]").

---

[3] Under New York law, if, "a party later claiming the right to rescind has continued to accept the benefits of the agreement or acted in some other fashion inconsistent with exercise of a right to rescind," that party will be deemed to have waived the misrepresentations and ratified the agreement. *Prudential Ins. Co. of Am. v. BMC Indus., Inc*., 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986). Ratification requires clearly established intent, and "may not be inferred from doubtful or equivocal language." *Am. Gen. Life Ins. Co. v. Salamon, et al*., No. 09–cv–5428, 2011 WL 976411, at *4 (E.D.N.Y. March 6, 2011).

SPA-16

Second, even if Defendants had raised ratification as an affirmative defense, the Court is not convinced that it would succeed because Plaintiffs have adequately alleged that the contract was void *ab initio*, not merely voidable, as Defendants appear to contend in their reply brief. *See* ECF No. 45. "It is a generally accepted principle that a *voidable* contract can be cured by ratification[.]" *Brown v. City of S. Burlington, Vt.*, 393 F.3d 337, 343 (2d Cir. 2004) (emphasis added) (citing 17A Am. Jur .2d Contracts § 11 (2004)). However, a party's claim that a "contract is *void* nullifies all aspects of the agreement […] giving neither party the power to ratify or disaffirm its provisions." *Romero v. Allstate Ins. Co.*, 143 F. Supp. 3d 271, 281-82 (E.D. Pa. 2015) (internal quotation marks omitted) (citing 6 Restatement (Second) of Contracts § 7 cmt. a ("[A void contract] is not a contract at all."); *see Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 107-09 (3d Cir. 2000) (explaining distinction between void and voidable contracts where making of an arbitration agreement in dispute). Accordingly, it is generally recognized that "a voidable contract may be ratified, while a void contract may not." *Allen v. Holiday Universal*, 249 F.R.D. 166, 172 (E.D. Pa. 2008) (emphasis in original).

Accordingly, at this stage of litigation, and "draw[ing] all reasonable inferences in favor of the non-moving party[,]" the Court concludes that Plaintiffs present sufficient evidence to substantiate their denial of the Agreement's validity and create a triable issue of fact with respect to whether John N. Blair lacked authority to execute the Agreement. *Meyer*, 868 F.3d at 74. Because, as a general matter, "parties that have not agreed to arbitrate claims may not be forced to do so[,]" Defendants' motion to compel arbitration is denied. *Barrows*, 36 F.4th at 50.

## CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is DENIED.

IT IS SO ORDERED.

16

SPA-17

Dated: February 23, 2024
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York